UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-62291-CIV-ALTMAN/Hunt

TIMOTHY LEE JOHNSON,

     *Plaintiff,*

*v.*

BROWARD COUNTY SHERIFF
SCOTT ISRAEL, *et al.,*

     *Defendants.*
_____/

## ORDER

     Timothy Lee Johnson was stopped by two officers as he drove into the parking lot of his apartment complex. While gathering his licence, registration, and insurance card, Johnson asked the officers why they had stopped him, queried whether he was under arrest, and told the officers that he wanted to call his lawyer. On Johnson's telling, the officers' reaction to these comments and questions was spiteful and swift: the officers (he says) yanked his phone away, ordered him out of his truck, and placed him in handcuffs. The officers then searched his vehicle and brought him into the police station, where a lieutenant—puzzled by the decision to bring him in—sent Johnson home. Once home, however, Johnson discovered that his car had been impounded.

     The officers issued Johnson two citations: one for unlawful window tinting and a second for non-violent resistance. Both citations were later dismissed. Johnson has now brought this civil rights action, averring that the officers and their sheriff violated his constitutional rights by unlawfully stopping him, arresting him, and searching his car. For the fourth time, the Defendants have moved to dismiss. This order follows.

THE FACTS[1]

This case began with an ordinary traffic stop. On November 22, 2013, Timothy Lee Johnson was driving home with a neighbor when police officers started trailing Johnson's SUV. *See* Third Amended Complaint [ECF No. 79] (the "TAC") ¶¶ 18, 37. Johnson turned into the private parking area of his apartment complex and pulled into his assigned parking spot. *Id.* ¶ 19. Once the car was parked, it didn't interfere in any way with traffic. *Id.* ¶ 34. Johnson says that, while his car's windows are tinted, the tinting falls within Florida's lawful limits. *Id.* ¶ 18. Deputies Justin Augustus and Timothy Metz (the "Deputies") followed Johnson into the parking lot, exited their police cruiser, and approached Johnson's car, demanding that Johnson provide his license, registration, and insurance card. *Id.* ¶ 19.

The traffic stop quickly devolved from there. While he was reaching into his back pocket to get his driver's license, Johnson explained that he was moving rather slowly because a back injury was causing him pain. *Id.* ¶ 20. He also asked why the Deputies had stopped him. *Id.* Angered by the question, Deputy Augustus answered in "harsh" terms: "Don't ask me no questions. Just do as you are told." *Id.* (cleaned up). Johnson followed up by asking whether he was "being detained or under arrest for something and, if so, what." *Id.* Hearing this second question, Deputy Metz interjected and, while expressing "extreme anger," told Johnson that he was "not under arrest *yet*." *Id.* ¶ 21. Johnson then said that he wanted to call his lawyer. *Id.* ¶ 22.

That last comment threw Deputy Augustus into a rage. Before Johnson knew what had happened, Deputy Augustus—who was then standing by the passenger-side door—reached over

---

[1] "We accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Luke v. Gulley*, 975 F.3d 1140, 1143 (11th Cir. 2020) (quoting *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019)).

Johnson's friend, admonished Johnson not to call his lawyer, and snatched Johnson's phone from his hand. *Id.* Having done all this, Deputy Augustus announced: "*now you're under arrest.*" *Id.* Deputy Metz then ordered Johnson and his friend out of the car. *Id.* ¶ 23. The Deputies placed Johnson in handcuffs and sat him on the bumper of his truck. *Id.* ¶ 39. According to Johnson, his friend (and neighbor) was "not considered a threat." *Id.* And the allegations support that: after the Deputies directed the friend out of the car, the Deputies never placed him under arrest, didn't secure him, and allowed him to saunter home. *Id.* ¶¶ 24, 39.

As Johnson sat handcuffed on the bumper of his SUV—and while his friend watched from his own apartment—the Deputies searched Johnson's car. *Id.* ¶ 23. Johnson "protest[ed]," but the Deputies ignored him. *Id.* After the search—which, as far as we can tell, revealed nothing—the Deputies moved Johnson (who had a rather severe back injury and couldn't sit upright) onto the floor of their police van. *Id.* ¶¶ 25, 40. During the fifteen-or-so-mile drive to the North Broward County Detention Facility, "each turn of the vehicle caused [Johnson] excruciating pain." *Id.* ¶ 28. Once Johnson arrived at the jail, an officer forced him into prison garments, and the jail's booking official questioned Johnson about his health. *Id.* ¶ 26.

When a "lieutenant-in-charge" asked him "why [he was] in jail," Johnson said: "don't know why." *Id.* ¶ 27. The lieutenant reviewed some papers that were handed to him by another officer, asked Johnson about his medical condition, and—learning that Johnson was diabetic—wondered aloud: "[W]hy is this man in my jail?" *Id.* The lieutenant then ordered some other officers to "get this man out of my jail now." *Id.* The officers handed Johnson his clothes and asked whether he wanted them to take him home or to the hospital. *Id.* ¶ 28. Although the arrest had increased Johnson's blood-sugar, he asked the officers to take him home. *Id.* ¶ 59.

When he returned home, Johnson discovered that the Deputies had impounded his vehicle. *Id.* ¶ 31. When he asked the towing company about it, the company's rep said that the Broward Sheriff's Office had placed a hold on the vehicle for inventory searching and that any questions regarding missing items would have to be addressed to the BSO. *Id.* Johnson alleges that this subsequent search of his SUV "resulted in[] twice the invasion [of] unlawful searching of [his] vehicle." *Id.* He also avers that, because his car was impounded, he incurred various "costs and fees associated with towing and storage as well as having to return the vehicle to its owners for fear of future harassment" by police officers. *Id.* ¶ 46.

Although the Deputies never gave him a citation, Johnson says that he later received a "Notice to Appear" in the mail. *Id.* ¶¶ 44–45. That Notice asserted that Johnson had committed two infractions: (1) "Side Wind/Rest Sunscreen Too Dark" and (2) "Resisting/Obstructing Justice Without Violence." *Id.* Johnson claims that the resistance charge was added "as a last effort attempt to *disguise* [his] unlawful arrest." *Id.* ¶ 44. He also explains that both charges were later "*dropped/dismissed.*" *Id.* In this lawsuit, Johnson sues Deputy Augustus (in his official and individual capacities), Deputy Metz (in his official and individual capacities), Broward County Sheriff Scott Israel (in his official capacity), and the City of Dania Beach. *Id.* ¶¶ 10–13.

A lot has happened since Johnson first filed this case in November 2017. As relevant here, we denied the first motion to dismiss as to some of Johnson's claims, and we dismissed others *without* prejudice. *See Johnson v. Israel*, 2020 WL 1060007, at *1 (S.D. Fla. Mar. 5, 2020) (Altman, J.). We ultimately dismissed Johnson's second amended complaint as a shotgun pleading. *See* Order [ECF No. 78]. Now, Johnson has filed his third amended complaint, *see* TAC, which the Defendants have (again) moved to dismiss, *see* Third Renewed Motion to Dismiss [ECF No. 82] (the "MTD").

4

In their MTD, the Defendants advance four arguments: *First*, they say that Johnson's complaint is a shotgun pleading. *Second*, they argue that they're entitled to qualified immunity on any claims arising from the stop, the arrest, the initial search, and the inventory search. *Third*, they contend that the Deputies and the Sheriff cannot be liable in their official capacities. *Fourth*, they ask us to strike Johnson's punitive-damages claims against the Deputies and the Sheriff. We'll navigate through each of these contentions in turn.

## THE LAW

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545).

On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). Unsupported factual allegations and legal conclusions, however, receive no such deference. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). A complaint's "well-pled allegations must 'nudge the claims across the line from conceivable to plausible.'" *Hays v. Page Perry, LLC*, 627 F. App'x 892, 896 (11th Cir. 2015) (cleaned up) (quoting *Twombly*, 550 U.S. at 555, 570).

## ANALYSIS

### A. Shotgun Pleading

As an initial matter, Johnson's complaint—filed *pro se*—easily satisfies federal pleading standards. A complaint in federal court must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "When a plaintiff files a shotgun pleading, he fails to satisfy these basic requirements. Such a pleading is never plain because it is impossible to comprehend which specific factual allegations the plaintiff intends to support which of his causes of action, or how they do so." *Est. of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358 (11th Cir. 2020). The Eleventh Circuit has identified four classes of shotgun pleadings. These are pleadings that:

> (1) contain multiple counts where each adopts the allegations of all preceding counts; (2) are filled with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; (3) do not separate each cause of action or claim into separate counts; or (4) assert multiple claims against multiple defendants but do not specify which defendant is responsible for which acts or omissions.

*Brown v. Air Line Pilots Ass'n*, 813 F. App'x 353, 355 (11th Cir. 2020) (cleaned up). "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds

upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). "[W]hile the shotgun pleading prohibition applies to *pro se* parties, *pro se* parties [are] entitled to more leniency." *Isaac v. United States*, 809 F. App'x 595, 598 (11th Cir. 2020).

In our case, Johnson—for the most part—avoids these pitfalls. He doesn't include counts that adopt the allegations of all proceeding counts. *See* TAC ¶¶ 32, 48, 62, 72, 82, 89. Nor is his complaint riddled with conclusory, vague, or immaterial allegations. In fact, Johnson presents a rather particularized—and cogent—explanation of the facts of his case. *Id.* ¶¶ 18–31. And he never just lumps the Defendants together. He, instead, carefully details what *each* officer did during the encounter: he tells us, for instance, which officer trailed him into the parking lot, *id.* ¶ 10; what each officer said to him, *id.* ¶¶ 35–37; and which officer snatched his phone and handcuffed him, *id.* ¶ 39.

The Defendants are probably right when they say that Johnson "fail[s] to separate the causes of action he attempts to allege into different counts." MTD at 4–5. For example, although Johnson included each *Defendant* in a separate count, he didn't divide his claims by *theory*—that is, he didn't split the unlawful stop, arrest, and searches into different counts. TAC ¶¶ 32–61. But he *did* break those three claims out in his general allegations. *Id.* ¶¶ 18–31 (including a separate section on each of these issues). And the Defendants never claim that they're somehow confused about what Johnson's causes of action are. *See generally* MTD. To the contrary, the Defendants' MTD easily sorts through Johnson's claims and addresses each of them one-by-one. *Id.* Nor do *we* have any difficulty understanding Johnson's claims: he was stopped, he was arrested, he was searched, and he thinks that the Deputies violated the Constitution when they did each of these things.

Could Johnson's complaint have been more artfully drafted? Probably. But "*pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally

construed." *Dressler v. Equifax, Inc.*, 805 F. App'x 968, 972 (11th Cir. 2020) (cleaned up) (concluding that the district court abused its discretion by dismissing the *pro se* plaintiff's complaint as a shotgun pleading); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]" (cleaned up)).

The Eleventh Circuit has likewise refused to countenance the dismissal of a *pro se* complaint everyone easily understood. *See, e.g.*, *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200 (11th Cir. 2019). In *Pinson*, the court of appeals found that the plaintiff's "*pro se* complaint adopts the allegations of all preceding counts." *Id.* at 1208. The court nevertheless concluded that "it does what complaints must do: it 'gives the defendant adequate notice of the claims against it and the grounds upon which each claim rests.'" *Id.* (quoting *Weiland*, 792 F.3d at 1323). In that respect, the court noted that it had "no trouble understanding [the plaintiff's] allegations" and that the defendant "understood the claims well enough to address their merits. . . in a motion to dismiss." *Id.* Swap "adopts the allegations of all preceding counts" for "includes multiple claims in one count" and the Eleventh Circuit's holding squarely disposes of this aspect of the MTD.

Or take *Pouyeh v. Public Health Trust of Jackson Health System*, 832 F. App'x 616 (11th Cir. 2020). There, the Eleventh Circuit rejected the district court's conclusion that dismissal "was warranted on shotgun-pleading grounds." *Id.* at 623. In doing so, the Court reasoned that, "[a]lthough [the plaintiff's] second amended complaint displays some of the characteristics of what we have described as shotgun pleadings, . . . we do not think the complaint, when liberally construed, fails to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* (cleaned up). That reasoning applies just as well here: although Johnson's complaint isn't perfect, it nevertheless

sets out a short and plain statement of the case and offers the Defendants adequate notice of the claims he's lodged against them. We therefore will not dismiss the complaint as a shotgun pleading.[2]

### B. Qualified Immunity

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). By imposing liability *only* for violations of clearly established law, the defense of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To qualify for the immunity, the officer "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). There can be no doubt that the Deputies in our case were acting within their discretionary authority because stops, arrests, and searches are "powers that legitimately form a part of their job." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1267 (11th Cir. 2004); *see also Burnett v. Unified Gov't of Athens-Clarke*

---

[2] We recognize that we previously instructed Johnson to correct certain aspects of his complaint. *See, e.g.*, Order [ECF No. 78]. And we think he's sufficiently done so by (for instance): (1) largely removing all legal analysis from his pleading; (2) presenting each fact in a separately numbered paragraph; and (3) developing certain factual points—including his relationship to the passenger, the location of his vehicle, whether the Deputies conducted a second search, and whether he told the Deputies that his back was injured. *See generally* TAC.

*Cnty.*, 395 F. App'x 567, 568 (11th Cir. 2010) ("The official responsibilities of a police officer on patrol include making traffic stops and arresting people who are suspected of committing traffic violations.").

Where, as here, "the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. "To overcome a qualified immunity defense, the plaintiff must make two showings." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019). *First*, "the plaintiff must establish that the defendant violated a constitutional right." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007). *Second*, "the plaintiff must show that the violation was clearly established." *Id.* Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Corbitt*, 929 F.3d at 1311 (quoting *Pearson*, 555 U.S. at 236).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Vinyard*, 311 F.3d at 1350 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "Put another way, the defendant must have fair notice of his conduct's unconstitutionality, which derives from one of the following sources: (1) the obvious clarity of constitutional or statutory language; (2) broad holdings or statements of principle in case law that are not tied to particularized facts; or (3) fact-specific judicial precedents that are not fairly distinguishable." *Eloy v. Guillot*, 289 F. App'x 339, 346 (11th Cir. 2008) (citing *Vinyard*, 311 F.3d at 1350–52). "The critical inquiry is whether the law provided [the officer] with 'fair warning' that his conduct violated the [the plaintiff's rights]." *McClish v. Nugent*, 483 F.3d 1231, 1248 (11th Cir. 2007) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

In this Circuit, only the "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the

Supreme Court of Florida) can clearly establish the law." *Id.* at 1237. "A motion to dismiss a complaint on qualified immunity grounds will be granted if the 'complaint fails to allege the violation of a clearly established constitutional right.'" *Griffin*, 496 F.3d at 1199 (quoting *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002)). "We are required to accept the facts as set forth in the plaintiff's complaint as true, and our consideration is limited to those facts contained in the pleadings and attached exhibits." *Id.* At the same time, "we must keep in mind the heightened pleading requirements for civil rights cases, especially those involving the defense of qualified immunity." *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003). The Eleventh Circuit has instructed that, "[i]n such cases, the complaint must allege the relevant facts with some specificity." *Id.* (cleaned up).[3]

### 1.  The Stop

Johnson has failed to establish that the Deputies violated his rights when they stopped his tinted truck. The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "A traffic stop constitutes a seizure within the meaning of the Fourth Amendment[.]" *United States v. Parker*, 512 F. App'x 991, 992 (11th Cir. 2013). "As a general matter, the decision to stop an automobile

---

[3] In *Amnesty International, USA v. Battle*, 559 F.3d 1170 (11th Cir. 2009), Judge Marcus—writing separately—explained that the Eleventh Circuit's "heightened pleading" standard for § 1983 cases "may not be altogether consonant with the latest Supreme Court law on pleadings." *Id.* at 1186 (Marcus, J., concurring); *see, e.g.*, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 513 (2002) (rejecting a judicially created heightened pleading standard for employment discrimination complaints because "complaints in these cases, as in most others, must satisfy only the simple requirements of Rule 8(a)"); *Leatherman v. Tarrant Cnty. N.I.C.U.*, 507 U.S. 163, 168–69 (1993) (explaining that heightened pleading standards "must be obtained by the process of amending the Federal Rules, and not by judicial interpretation"). While we share Judge Marcus's skepticism of judicially created pleading standards—circumventing, as they do, the congressionally approved pleading requirements of Rule 8—we are bound to apply the Eleventh Circuit's heightened standard in this case. To avoid any doubt about our holding, though, we here clarify that our ruling would be the same—heightened pleading or not.

is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). "Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." *United States v. Pierre*, 825 F.3d 1183, 1192 (11th Cir. 2016) (cleaned up) (quoting *United States v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986)).

Florida law makes it a traffic violation to drive with windows that are tinted beyond certain statutory limits. *See* FLA. STAT. § 316.2953. In general, that law prohibits the use of "any sunscreening material or other product . . . which would . . . reduce [the window's] light transmittance" below the statutory threshold of "28 percent in the visible light range." *Id.* "A traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment." *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003). Because the law doesn't expect mathematical certainty in an officer's on-the-job assessments—which, after all, the officer often makes in the heat of the moment—the fact "[t]hat the window tint on [a driver's] car . . . was *in fact* within the statutory limit does not make the traffic stop unlawful." *United States v. Davis*, 815 F. App'x 370, 373 (11th Cir. 2020) (emphasis added).

In our case, Johnson concedes that his truck had "tinted windows." TAC ¶ 18. And, while Johnson claims that the truck's tinting fell "within the lawful limits," *id.*, that fact—standing alone—isn't dispositive. Instead, what matters is whether "an objective officer under the circumstances could have believed reasonably that [Johnson's] car was in violation of Florida's window-tint statute." *Davis*, 815 F. App'x at 373. And, unfortunately, Johnson has alleged *no* facts from which we might reasonably infer that the Deputies lacked a reasonable basis to believe that his tints violated the statute. *See generally*

12

TAC. He doesn't allege, for instance, that his windows were so lightly tinted that they didn't come close to violating the statutory limit. *Id.* He doesn't claim that his windows were so transparent that the Deputies could see easily through them. *Id.* And he doesn't say that it was too dark out that day for the Deputies to have properly assessed the tint level of his windows. *Id.* For all these reasons, he hasn't plausibly alleged that the Deputies pulled over his admittedly tinted truck without probable cause.[4]

All Johnson has given us, in other words, is his claim that his truck was tinted within legal limits. But the Eleventh Circuit has repeatedly held that *this fact* isn't enough to show that an officer lacked probable cause for a traffic stop. *See, e.g.*, *United States v. Jackson*, 558 F. App'x 932, 934–35 (11th Cir. 2014) ("Even if the windows did not turn out to violate Florida law, a stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment."); *United States v. Weaver*, 145 F. App'x 639, 641 (11th Cir. 2005) (concluding that an officer can stop a car for illegal window tinting "when he reasonably believes the statute is being violated" and that to require certainty before the stop "would force police to ascertain conclusively whether a violation had occurred before they would have the probable cause to investigate it"). It isn't enough, in short, for Johnson to allege that his windows were lawfully tinted.

Courts across the country have refused to impose liability on police officers in similar circumstances. Take *Lyles v. Conner*, 2010 WL 11628790 (E.D. Tex. Apr. 8, 2010), for example. In that case, the plaintiff—who, as here, was pulled over for tinted windows—"refute[d] the claim that his

---

[4] We're, of course, mindful that Johnson has filed this action *pro se*. But we're now on Johnson's *third* amended complaint. And, despite having received four opportunities to clarify this issue (including two chances *after* we first ruled on the issue), he's still fallen short of approaching plausibility on his unlawful-stop claim.

13

window tint was too dark." *Id.* at *2. In granting the officers' request for qualified immunity at summary judgment, however, the court reasoned that "[t]roopers are not required to know to a certainty whether the tint is too dark before pulling [a driver] over." *Id.* at *6. Instead, "police officers who reasonably but mistakenly conclude that probable cause is present are entitled to qualified immunity." *Id.* (cleaned up). And (crucially) the plaintiff in that case "ha[d] not alleged any facts that [the defendants'] conclusion that the window tint was too dark was unreasonable." *Id.* That case is on all fours with ours. Even though his tinting was lawful, Johnson failed to allege that the Deputies' conclusion that his windows were too dark was *unreasonable.*

In this regard, *Lyles* is no aberration. *See, e.g., Shahit v. City of Detroit Police Officer Tosqui*, 2005 WL 1345413, at *10 (E.D. Mich. June 1, 2005) (rejecting the plaintiff's contention that his stop was unlawful because his tinting was within legal limits and noting that officers "need not make a precise assessment in order to stop the vehicle"), *aff'd sub nom. Shahit v. Tosqui*, 192 F. App'x 382 (6th Cir. 2006); *Flowers v. Rustand*, 2012 WL 4567596, at *4 (E.D.N.Y. Oct. 1, 2012) ("No case yet has required police to carry a tint-o-meter, and a reasonable officer could well believe that it is within his discretion to make a determination of whether the tint is sufficient to warrant a stop."); *Gass v. Murphy*, 2013 WL 5488712, at *5 (M.D. Pa. Sept. 30, 2013) ("There is no dispute that the plaintiff's windows were tinted, therefore, [the trooper] had reasonable suspicion to pull him over to investigate whether the windows were so tinted as to prevent a person from looking through them.").[5]

---

[5]     The Defendants offer another basis for dismissing Johnson's claim. They point out that, in his original and first amended complaints, Johnson alleged that his truck had "dark tinted windows." *See* Complaint [ECF No. 1] ¶ 8; First Amended Complaint [ECF No. 33] ¶ 8. The Defendants contend that Johnson *purposely* omitted this allegation from his most-recent complaint in a clever attempt to avoid dismissal. *See* MTD at 11. And they say that, "where a plaintiff seeks to directly contradict or blatantly omit dispositive factual admissions that have already been pled, allegations in original

\*        \*        \*

Johnson, in sum, failed to plausibly allege that the stop was unreasonable—much less that, in pulling him over, the Deputies' conduct was "plainly incompetent." *Stanton v. Sims*, 571 U.S. 3, 6 (2013). We thus **DISMISS** Johnson's traffic-stop claim (as it appears in Counts I and II) **with prejudice**.[6]

### 2.   The Arrest

On the other hand, Johnson *has* adequately alleged that the Deputies violated his clearly established rights by arresting him without probable cause. "[I]t is well established that an arrest without probable cause is an unreasonable seizure that violates the Fourth Amendment." *Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010). "While an officer who arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity." *Fox v. Graff*, 276 F. App'x 936, 938 (11th Cir. 2008) (cleaned up). Instead, "law

---

pleadings can be considered." *Id.* at 11. For this proposition, the Defendants cite *Fernandez v. School Board of Miami-Dade County*, 201 F. Supp. 3d 1353, 1361 (S.D. Fla. 2016), which (in turn) relied on several Second Circuit decisions holding that courts "[i]n rare circumstances . . . will consider prior pleadings . . . when the plaintiff directly contradicts the facts set forth in his original complaint," *id.* at 1361 n.1 (quoting *2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 206 (S.D.N.Y. 2015)). If that law applied here, then we'd have yet another reason to dismiss Johnson's unlawful-stop claim.

But, while the Second Circuit has allowed defendants to reach back into prior (abandoned) complaints to attack a plaintiff's *current* allegations, that's just not the law in our Circuit. *See, e.g., Seiger by & through Seiger v. Philipp*, 735 F. App'x 635, 638 (11th Cir. 2018) (recognizing that a second amended complaint "supersede[s] the previous complaints and render[s] null their contradictory allegations"); *Varnes v. Loc. 91, Glass Bottle Blowers Ass'n of U.S. & Can.*, 674 F.2d 1365, 1370 (11th Cir. 1982) ("As a general rule, an amended complaint supersedes and replaces the original complaint unless the amendment specifically refers to or adopts the earlier pleading."); *Dresdner Bank AG v. M/V Olympia Voyager*, 463 F.3d 1210, 1215 (11th Cir. 2006) ("An amended pleading supersedes the former pleading; the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary." (cleaned up)). In short, we decline to grant the MTD *on that basis.*

[6] More on why this dismissal is *with*—rather than *without*—prejudice below (q.v. note 21).

enforcement officers will be entitled to qualified immunity if they had even 'arguable probable cause.'" *Hardigree v. Lofton*, 992 F.3d 1216, 1225 (11th Cir. 2021) (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1251 (11th Cir. 2013)). Arguable probable cause exists if "reasonable officers in the same circumstances and possessing the same knowledge as the [officer] could have believed that probable cause existed to arrest." *Lee*, 284 F.3d at 1195.

Our Deputies try to justify the arrest by relying on Florida's obstruction-without-violence statute, which makes it a crime to "resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer." FLA. STAT. § 843.02. To render this provision consistent with the First Amendment's protection of speech, "Florida courts have generally held, with very limited exceptions, that physical conduct must accompany offensive words to support a conviction under § 843.02." *Davis v. Williams*, 451 F.3d 759, 765 (11th Cir. 2006). "Words alone may result in obstruction of justice where the officer in question is 1) serving process; 2) legally detaining a person; or 3) asking for assistance." *Francis v. State*, 736 So. 2d 97, 99 n.2 (Fla. 4th DCA 1999).

The Deputies lacked even arguable probable cause to believe that Johnson was resisting, obstructing, or opposing them in the *lawful* execution of their legal duties. Taken in the light most favorable to Johnson, the facts are these: Johnson was pulled over. TAC ¶ 19. As he was complying with Deputy Metz's demand by reaching for his driver's license, he simultaneously asked the Deputies why they'd stopped him. *Id.* ¶ 20. After Deputy Augustus barked: "Don't ask me no questions[;] just do as you are told," Johnson wondered whether he was "being detained or under arrest, and if so, [for] what?" *Id.* ¶ 51. When Deputy Metz expressed "extreme anger" and warned Johnson that he wasn't "under arrest *yet*," Johnson told the Deputies that he wanted to call his lawyer. *Id.* ¶ 52. That's

it: Johnson wondered why he'd been stopped, asked whether he was under arrest, and said that he wanted to call his lawyer. There's absolutely no indication that, during this short exchange, Johnson failed to supply his license, registration, and insurance or that he in any way interfered with the Deputies' ability to conduct the traffic stop. He wasn't yelling; he wasn't talking over the Deputies; he wasn't deploying fighting words. It's true that Johnson asked the Deputies questions *while* he was complying with their demands. But we live in a free nation, where people are empowered to question—even criticize—the servants of the law without fear of prosecution. Johnson, in short, wasn't resisting, obstructing, or opposing anything—nor was he even *arguably* doing so.

And the law is clearly established that the Deputies lacked arguable probable cause in these circumstances. Let's start with *City of Houston v. Hill*, 482 U.S. 451 (1987), where the Supreme Court struck down an ordinance that restricted speech which "in any manner . . . interrupt[s]" an officer, *id.* at 462. In doing so, the Court explained that "[t]he Constitution does not allow such speech to be made a crime." *Id.* Indeed, the "First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Id.* at 461. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462–63. By 1987, then, it was clearly established that officers cannot place someone under arrest for mere "verbal opposition"—which, on Johnson's allegations, is exactly what happened here.[7]

---

[7]     Two notes on *Hill*. *First*, Florida courts have "given [§ 843.02] a limiting construction that avoids the overbreadth deficiency found in the Houston ordinance by the Court in *Hill*." *Wilkerson v. State*, 556 So. 2d 453, 456 (Fla. 1st DCA 1990); *see also D.A.W. v. State*, 945 So. 2d 624, 626 (Fla. 2d DCA 2006) ("This distinction between verbal harassment and obstructive conduct is not only consistent with the definition of this offense as set forth in section 843.02, but it is also necessary to ensure that the offense as defined does not infringe upon rights of free speech under the First

Since then, the Eleventh Circuit has (on many occasions) applied this principle to factual scenarios that closely resemble ours. Judge Marcus's opinion in *Skop v. City of Atlanta*, 485 F.3d 1130 (11th Cir. 2007), is instructive. In that case, the plaintiff, Laura Skop, was driving home when she found her driveway blocked by a police car. *Id.* at 1133. As it would later turn out, the officer had blocked off the street because a tree had fallen some 110 feet from Skop's driveway. *Id.* After honking and getting no response, Skop rolled down her window and tried to tell the officer that she needed to get into her driveway. *Id.* at 1134. When the officer ignored her, she alighted her car and walked over to the officer's window. *Id.* Although the officer rolled down his window, he immediately began yelling at Skop about the downed tree. *Id.* When Skop asked for the officer's name and badge number, he jumped out of his car, slammed his door, and arrested her for obstruction. *Id.*

Applying Georgia law, the Eleventh Circuit concluded that the officer lacked even "arguable probable cause" to arrest Skop. In saying so, the court concluded: "the argument that [the officer] was

---

Amendment."). The Florida crime of non-violent resistance, in other words, is circumscribed by the Supreme Court's decision in *Hill*. The upshot is, since the 1980s, the law has been clear: words alone (in most cases) cannot supply the basis for an arrest. And Florida courts have repeatedly recognized this fundamental precept. *See, e.g.*, *S.N.J. v. State*, 17 So. 3d 1258, 1260 (Fla. 2d DCA 2009) ("Words alone rarely, if ever, amount to an obstruction."); *W.W. v. State*, 993 So. 2d 1182, 1185 (Fla. 4th DCA 2008) ("With limited exceptions, physical conduct must accompany offensive words to support a conviction under [section 843.02]." (quoting *Francis*, 736 So. 2d at 98)).

*Second*, in *Hill*, the Supreme Court left open the possibility that, in limited cases, speech may amount to "physical obstruction of police action." 482 U.S. at 463 n.11. For example, "a municipality constitutionally may punish an individual who chooses to stand near a police officer and persistently attempt to engage the officer in conversation while the officer is directing traffic at a busy intersection." *Id.* A municipality may also punish someone who "runs beside an officer pursuing a felon in a public street shouting at the officer." *Id.* (cleaned up). In *those* kinds of situations, the person's speech may fairly be said to "physically obstruct" the officer. *Id.* Why is this relevant here? Well, because discovery may reveal that Johnson *was* talking over the Deputies, that he *was* delaying the stop in a way that endangered them, or that he *did* fail to comply with their commands. But, taking Johnson's allegations as true—and viewing them (as we must) in the light most favorable to him— there's no indication that Johnson's words came close to this kind of *physical* obstruction.

impeded in this duty because Skop asked [him] to pull his car one foot forward—a request politely made, without raised voice or threat, and in a situation where she was not distracting his attention from a threatening situation—is utterly devoid of merit." *Id.* at 1138. In drawing this conclusion, the court observed that the arrest flagrantly violated Skop's First Amendment rights:

> Indeed, the idea that Skop's brief inquiry to the officer somehow provided a basis for arrest collides head-on with the First Amendment, which "protects a significant amount of verbal criticism and challenge directed at police officers . . . . The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *See Houston v. Hill*, 482 U.S. 451, 461–63 (1987). When, as under Skop's version of the facts, an individual does not even engage in speech that amounts to protected "criticism and challenge," but simply reiterates or attempts to clarify a perfectly reasonable question directed to the officer, there is neither probable cause nor arguable probable cause to arrest for obstruction.

*Id.* at 1139. It probably didn't take the Eleventh Circuit saying so for it to be obvious that a person cannot—consistent with our constitutional rights—be arrested for "a perfectly reasonable question directed to [an] officer." But, given *Skop*, it seems fair to conclude that this principle is beyond peradventure today. Like Ms. Skop, Johnson did little more than pose perfectly reasonable questions to the Deputies—questions about why he was stopped and whether he was under arrest. And, as in *Skop*, these questions didn't supply the Deputies with a basis to arrest Johnson for exercising his First Amendment rights.

The Eleventh Circuit addressed a similar series of events in *Davis v. Williams*, 451 F.3d 759 (11th Cir. 2006). There, the plaintiff, Donovan Davis, noticed flashing police lights outside his house. *Id.* at 763. Worried that a family member may have been involved in an accident, Davis approached the scene. *Id.* As he did so, David noticed that a police officer had stopped a vehicle. *Id.* As Davis got closer, the officer twice told him to leave. *Id.* Davis initially turned away. But he grew concerned about what he perceived to be a traffic hazard: the officer was blocking the road, forcing cars towards an

unlit lake. *Id.* When Davis returned to the scene to warn the officer about this hazard, he was again told to leave two more times. *Id.* At that point, as he turned back towards his house, Davis asked to speak with the officer's superior and one of Davis's guests asked for the officer's badge number. *Id.* Frustrated by what he perceived to be non-compliance, the officer arrested Davis. *Id.*

Applying the very same Florida statute at issue here, the Eleventh Circuit held that the officer "did not have even *arguable* probable cause to arrest [Davis]." *Id.* at 764 (emphasis added). The court reasoned that "[n]either an owner's simple inquiry as to why officers are present on his property nor a person's attempt to bring a dangerous situation to the officer's attention can be construed as obstruction of justice or disorderly conduct." *Id.* at 767. "Nor can a citizen be precluded by the threat of arrest from asking to speak to an officer's superior or from asking for an officer's badge number. Those inquiries likewise do not constitute obstruction of justice or disorderly conduct." *Id.* It would take an exercise in logical contortionism to reach anything but the same result here. Johnson's "simple inquiry" as to why the officers had stopped his car and his request to call his lawyer can't possibly be construed as obstruction. And no reasonable officer would think otherwise.

And, for what it's worth, the facts in *DeRosa v. Sheriff of Collier County*, 416 F. App'x 839 (11th Cir. 2011), were nearly identical to ours.[8] In that case, the plaintiff, Kathleen DeRosa, was riding in

---

[8] We say "for what it's worth" because we recognize that "[u]npublished cases . . . do not serve as binding precedent and cannot be relied upon to define clearly established law." *Crocker v. Beatty*, 995 F.3d 1232, 1241 n.6 (11th Cir. 2021) (quoting *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1260 n.1 (11th Cir. 2018)). We're also mindful of the fact that a right must be "'clearly established' *at the time of the challenged conduct.*" *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (emphasis added). In our case, that means Johnson's rights must have been clearly established by November 22, 2013—the day of his arrest. *See* TAC ¶ 49. And we think it's clear—as we'll explain below—that the published, pre-2013 decisions we've just cited (*Hill*, *Skop*, and *Davis*) clearly established that the Deputies violated Johnson's constitutional rights in our case. When we cite unpublished or post-2013 decisions, then, we do so, not because those decisions clearly establish any

the backseat of a car that an officer had stopped for using high-beam lights. *Id.* at 839–40. After the officer asked the driver for his license, DeRosa spoke to the driver "three times about the location of his license and, on each occasion, [the officer] told [DeRosa] to 'shut up.'" *Id.* at 840. In response, DeRosa "told [the officer] that he 'really needed to work on his community service skills.'" *Id.* The officer placed DeRosa under arrest for (what he called) non-violent resistance—citing the same Florida statute the Defendants rely on here. *Id.* In affirming the district court's order denying qualified immunity, the Eleventh Circuit—relying in part on *Hill*—held that DeRosa "did not come close to obstructing [the officer] in the execution of his lawful duties." *Id.* That's because her "criticisms of [the officer], even if distracting, did not incite others against, interfere with, or impede [the officer] from citing [the driver] for his traffic infraction." *Id.* Our case is just the same: Johnson never interfered with the Deputies' ability to cite him. And, while the Deputies may have been offended by Johnson's questions, perceived verbal slights cannot supply the basis for a lawful arrest.

And those are just a few of the many Eleventh Circuit decisions zealously guarding the individual's right to subject officers to questioning and criticism—even over appeals to qualified immunity. *See, e.g.*, *Andrews v. Scott*, 729 F. App'x 804, 811 (11th Cir. 2018) ("[A] person may ask reasonable questions of a police officer without giving rise to probable cause or arguable probable cause for obstruction of justice."); *Carr v. Cadeau*, 658 F. App'x 485, 489 (11th Cir. 2016) (holding that an officer lacked arguable probable cause to arrest the plaintiff who, in response to the officer's

---

law (they obviously don't), but because those decisions (1) recognize the law that *is* clearly established (mainly by relying on the same cases we've cited) and (2) apply that clearly established law to *similar* facts. *Cf. Waldron v. Spicher*, 954 F.3d 1297, 1307 (11th Cir. 2020) ("Binding case law in this Circuit holds that the 'relevant legal landscape'—including even cases from outside our Circuit and unpublished cases—are informative in a court's determination of whether a particular constitutional right is clearly established.").

demand to get off the road, said "what, what the fuck" and "I live here"); *Petithomme v. Cnty. of Miami-Dade*, 511 F. App'x 966, 971–72 (11th Cir. 2013) ("Plaintiff's questions directed towards the Officers as to what type of vehicle they were investigating and why they were searching her vehicle cannot give rise to arguable probable cause because verbal interruptions and simple inquiries as to an officer's purpose cannot be construed as obstruction under Florida law."); *Thompson v. Mostert*, 489 F. App'x 396, 397 (11th Cir. 2012) (affirming the denial of qualified immunity where a parent was arrested because he advised his son, who was being investigated, not to "say another word," "cautioned [the officer] not to be disrespectful," and "suggested that [the officer's] shoulder microphone had recorded [the officer's] threat"); *cf. Robinson v. City of Boynton Beach*, 2018 WL 8139307, at *2 (S.D. Fla. Jan. 23, 2018) (Marra, J.) (denying qualified immunity when, during a traffic stop, a passenger talked back to an officer who had instructed the driver to "shut the fuck up").

Even beyond our Circuit, in fact, the federal circuit courts routinely deny qualified immunity in similar circumstances.[9] *See, e.g.*, *Wilson v. Kittoe*, 337 F.3d 392, 400 (4th Cir. 2003) (denying immunity where an officer arrested the plaintiff for attempting to "engage[] [the officer] in conversation" four times while the officer was conducting an investigation); *Posr v. Ct. Officer Shield No. 207*, 180 F.3d 409, 415 (2d Cir. 1999) (Calabresi, J.) (denying qualified immunity where the plaintiff was arrested for telling the officer: "[o]ne day you're gonna get yours"); *Enlow v. Tishomingo Cnty.*, 962 F.2d 501, 509 (5th Cir. 1992) (denying qualified immunity where the plaintiff "merely inquir[ed] about the search and arrest warrants"); *Buffkins v. City of Omaha*, 922 F.2d 465, 472 (8th Cir. 1990) (denying

---

[9] None of these out-of-circuit decisions (it's true) can clearly establish the law in our District. We cite them here, though, because the unanimity courts have shown on this basic question of constitutional law strongly suggests that the issue is an obvious one—that, in other words, a police officer cannot arrest a person who, *while complying with an officer's demands*, asks an innocuous question.

qualified immunity where a woman called a police officer an "asshole"); *Bailey v. Andrews*, 811 F.2d

366, 371 (7th Cir. 1987) (denying qualified immunity to an officer who arrested the plaintiff for stating

"I want my damn dog" and asking "did you shoot my dog?").

> Even legal commentators have joined the fray:

> As a general proposition the offense [of obstruction] is made out where the defendant threatens the officer and apparently intends to carry out his threats by acts which could be harmful to the officer. In the absence of such threats the courts are substantially agreed that no obstruction lies where the defendant complains of the propriety of the officer's actions, asks informational questions of the officer, or requests the officer to release an alleged offender.

Note, *Types of Activity Encompassed by the Offense of Obstructing a Public Officer*, 108 U. Pa. L. Rev. 388, 390–

91 (1960). And, indeed, American and British courts have, for *hundreds* of years, shielded from

governmental interference the very kinds of speech the Deputies targeted here. *See, e.g.*, *People, on*

*Complaint of Koehler, v. Magnes*, 187 N.Y.S. 913, 913 (Ct. Gen. Sess. 1921) ("To ask a question or

questions of a police officer, propounded in a quiet and gentlemanly way, can under no circumstances

be regarded as disorderly conduct."); *The King v. Cook*, 11 C.C.C. 32, 33 (Can. B.C. Cnty. Ct. 1906)

("Now up to this point he had committed no crime, as in a free country like this citizens are entitled

to express their opinions without thereby rendering themselves liable to arrest unless they are inciting

others to break the law; and policemen are not exempt from criticism any more than Cabinet

Ministers."); *Commonwealth ex rel. Walker v. Sheriff*, 3 Brewst. 343, 343 (Pa. Ct. Quarter Sess. 1869) ("The

other officer swears that the relator stepped in front of him and demanded his [badge] number. There

was also some remonstrance against what was supposed to be unnecessary violence. There was really

no hinderance or obstruction. The demand for the number of an officer is no crime, nor is the

momentary standing in front of him. Still less is it an offence to remonstrate, provided there is no

incitement to resistance."); *Levy v. Edwards*, 171 Eng. Rep. 1094, 1 Car. & P. 40 (Nisi Prius 1823)

(where a constable breaks up a fight between two boys and proceeds to handcuff one of them, the constable may not arrest a third party who objects by saying: "you have no right to handcuff the boy").

All of this leads us to one ineluctable conclusion: Johnson's right *not* to be arrested for directing two harmless questions and one innocuous comment at a police officer was clearly established long before he pulled into his parking spot. A right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Although binding authority "need not have held 'the very action in question' to be unlawful, the unlawfulness of the action 'must be apparent' under the law in existence at the time of the violation." *Sosa v. Martin Cnty.*, 13 F.4th 1254, 1275 (11th Cir. 2021) (quoting *Corbitt*, 929 F.3d at 1312). When faced with false-arrest claims under § 1983, the Eleventh Circuit has indicated that the absence of arguable probable cause is dispositive on the question of whether the arrest violated clearly established law. *See Cozzi v. City of Birmingham*, 892 F.3d 1288, 1297–98 (11th Cir. 2018) ("Because [the plaintiff] was arrested without arguable probable cause, '[t]he second qualified immunity inquiry is, in the context of this case, straightforward: our binding precedent clearly established, at the time of [the plaintiff's] arrest, that an arrest made without arguable probable cause violates the Fourth Amendment's prohibition on unreasonable searches and seizures.'" (quoting *Skop*, 485 F.3d at 1143-44)). On this view, our analysis is straightforward: because the Deputies lacked arguable probable cause, Johnson's arrest violated clearly established law.

At the same time, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. This admonition may suggest that a finding that an officer lacked arguable probable cause—standing alone—is too broad a basis for imposing liability. Assuming that's so, the Eleventh Circuit has outlined three bases for identifying

clearly established law, and we think this case satisfies all three. *First*, "the words of the pertinent . . . statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law*." *Vinyard*, 311 F.3d at 1350. This basis will apply, for instance, where "the official's conduct lies so obviously at the very core of what the [statute or Constitution] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Lee*, 284 F.3d at 1199 (cleaned up).

Both the obstruction statute and the First Amendment apply with "obvious clarity" to our facts. *Vinyard*, 311 F.3d at 1350. Starting with the statute, it plainly makes it unlawful *only* to "resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty." FLA. STAT. § 843.02. But, according to his complaint, Johnson did nothing to resist, obstruct, or oppose the Deputies in executing their traffic stop. To the contrary, he immediately complied with their demands to gather his license, registration, and insurance. And there's no indication that his words alone impeded the Deputies' ability to do anything. The First Amendment's prohibition against laws "abridging the freedom of speech," U.S. CONST. amend. I, likewise applies with "obvious clarity" here. Speech that questions or challenges governmental action lies at the very core of the First Amendment's protections, and we think it obvious that the Government cannot criminally punish someone for harmlessly invoking *other* constitutional rights—in our case, Johnson's Fourth Amendment right against unreasonable seizures and his Sixth Amendment right to an attorney.

*Second*, the Eleventh Circuit has explained that "some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." *Vinyard*, 311 F.3d at 1351; *see also Waldron*, 954 F.3d at 1305 (recognizing that a

"plaintiff can also show that a broader, clearly established principle should control the novel facts of a particular case"). To our mind, the principles outlined in *Hill*, *Skop*, and *Davis* gave the Deputies "fair warning" that the arrest they effectuated here was without probable cause and, therefore, unlawful. *Hope*, 536 U.S. at 740. The *Hill* Court, for instance, exalted "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest." *Hill*, 482 U.S. at 462–63. In *Skop*, the Eleventh Circuit made clear that officers aren't immune from "criticism and challenge" and warned that, "[w]hen . . . an individual . . . simply reiterates or attempts to clarify a perfectly reasonable question directed to the officer, there is neither probable cause nor arguable probable cause to arrest for obstruction." *Skop*, 485 F.3d at 1139. And *Davis* stands for the commonsense proposition that neither a "simple inquiry" nor a request "to speak to an officer's superior" can constitute obstruction. *Davis*, 451 F.3d at 767. Taken together, these decisions enunciate an unambiguous legal principle: that a person who's otherwise complying with an officer's commands cannot be arrested *solely* for asking the officer a question or inquiring about a lawyer—which is precisely what (Johnson says) happened here.

*Third*, a plaintiff "can show that a materially similar case has already been decided, giving notice to the police." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). The question, on this method, is "whether the factual scenario that the official faced is fairly distinguishable from the circumstances facing a government official in a previous case." *Bailey v. Wheeler*, 843 F.3d 473, 484 (11th Cir. 2016) (quoting *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012)); *see also Vinyard*, 311 F.3d at 1352 (same). Our case isn't "fairly distinguishable" from the facts of *Skop* or *Davis*. In *Skop*, the Eleventh Circuit held that the plaintiff had not obstructed law enforcement by asking the officer a "perfectly reasonable question"—*viz.*, to move his cruiser past her driveway. *Skop*, 485 F.3d

at 1139. In *Davis*, the circuit court similarly found that the plaintiff had been unlawfully arrested because "[n]either an owner's simple inquiry as to why officers are present on his property nor a person's attempt to bring a dangerous situation to the officer's attention can be construed as obstruction of justice." *Davis*, 451 F.3d at 767. In our case, Johnson was arrested—ostensibly for obstruction of justice—after directing two "perfectly reasonable question[s]" and asking to call his lawyer. As in *Skop*, there's no indication that Johnson "impeded or obstructed [the Deputies] in the pursuit of [their] lawful duties." *Skop*, 485 F.3d at 1138.

There is, it's true, one difference between our case and those others. In our case, Johnson had been lawfully detained—whereas neither Skop nor Davis had been the *subject* of a traffic stop. But this is a distinction without a difference. That's because neither of those decisions turned on the detention status of the speaker. To the contrary, both cases found that the plaintiff's speech *alone* "did not physically interfere with or obstruct the deputies" under the plain meaning of the obstruction statute, *Davis*, 451 F.3d at 766, and that "the First Amendment . . . 'protects a significant amount of verbal criticism and challenge directed at police officers,'" *Skop*, 485 F.3d at 1139 (quoting *Hill*, 482 U.S. at 461–63). It's for these reasons that federal courts—including the Eleventh Circuit—consistently deny qualified immunity where (as here) officers arrest a *detainee* based on his or her speech. *See, e.g.*, *DeRosa*, 416 F. App'x at 841 (denying qualified immunity to an officer after he arrested the passenger of a stopped vehicle who kept talking after being told to "shut up" three times); *Robinson*, 2018 WL 8139307, at *2 (denying qualified immunity when, during a traffic stop, a passenger talked back to an officer who had instructed the driver to "shut the fuck up").[10]

---

[10]     One might also try to distinguish our case on the basis that Johnson asked the Deputies a question (and expressed an interest in calling his lawyer) *after* Deputy Augustus told him not to "ask

Given the "obvious clarity" of these legal principles, the centrality of free speech to our constitutional system, and the overwhelming weight of authority (in this Circuit and elsewhere), we think that the unlawfulness of Johnson's arrest should've been "readily apparent" to any reasonable officer. *Cf. Skop*, 485 F.3d at 1144 ("When an officer plainly violates the legal rights of the people he serves, and when a reasonable officer in his position had fair warning that his conduct was unlawful, § 1983 suits exist to provide a vehicle for recourse.").

Against all this, the Defendants raise two arguments—both unpersuasive.

*First*, misrepresenting the complaint, the Defendants suggest that Johnson failed to comply with the Deputies' orders:

> [A]ccording to Plaintiff's own admissions . . . , Plaintiff stated that the Deputies pulled him over and asked for his driver's license, registration, and insurance card. *Instead of complying with said requests*, Plaintiff began questioning the Deputies; then, after being instructed to do as he was told, Plaintiff continued to ask questions and asserted that he wished to call his attorney.

---

[him] no questions" and to "[j]ust do as [he was] told[.]" TAC ¶ 20. In *Davis*, however, the officers instructed the plaintiff to leave the scene of a traffic stop at least *four* times before they arrested him. *Davis*, 451 F.3d at 763. Still, the Eleventh Circuit held that the officers lacked even "arguable probable cause" for the arrest. *Id.* at 767. In *DeRosa*, too, the officer told the plaintiff to "shut up" *three* times before finally arresting her. *DeRosa*, 416 F. App'x at 840. Nevertheless, the Eleventh Circuit denied qualified immunity, holding that the plaintiff "did not come close to obstructing [the officer] in the execution of his lawful duties." *Id.*

And these decisions make sense in light of the plain language of Florida's obstruction statute. That statute, as we've said, makes it a crime to "resist, obstruct, or oppose any officer . . . in the *lawful* execution of any legal duty." FLA. STAT. § 843.02 (emphasis added). And an officer, constrained by the Constitution, isn't engaged in the "*lawful* execution of any legal duty" when he prevents a detainee from engaging in harmless, constitutionally protected speech. *Hill*, 482 U.S. at 462 (striking down an ordinance that restricted speech which "in any manner . . . interrupt[s]" an officer). In other words, a police officer cannot arrest someone under the obstruction statute for failing to abide by an unlawful directive. *See, e.g.*, *C.E.L. v. State*, 24 So. 3d 1181, 1185 (Fla. 2009) ("[T]o support a conviction for obstruction without violence, the State must prove . . . the officer was engaged in the lawful execution of a legal duty[.]"); *see also Jay v. State*, 731 So. 2d 774, 776 (Fla. 4th DCA 1999) (recognizing that, where an officer is not *lawfully* executing a legal duty, the suspect is "free to resist . . . without violence").

MTD at 12 (emphasis added). But Johnson never alleged that he failed to comply with the Deputies' instructions. Quite the opposite. Johnson said that he asked his questions "while reaching for his driver's license from his rear pocket" and "[w]hile in the process of obtaining the documents" Deputy Metz had requested. TAC ¶¶ 20, 35. At this stage, "we accept the plaintiff's allegations in the complaint as true, and we construe them in the light most favorable to the plaintiff." *Godelia v. Doe 1*, 881 F.3d 1309, 1316 (11th Cir. 2018). Under this permissible standard, Johnson has adequately alleged that he *was* complying with the Deputies' commands. All we're left with, then, is the Defendants' contention that, "after being instructed to do as he was told, Plaintiff continued to ask questions and asserted that he wished to call his attorney." As we've explained, however, directing harmless questions and asking about a lawyer doesn't, in this country, constitute obstruction.[11]

*Second*, the Defendants cite three cases—all unhelpful. The first is *Post v. City of Fort Lauderdale*, 7 F.3d 1552 (11th Cir. 1993). In that case, the Eleventh Circuit *did* find arguable probable cause to arrest the plaintiff for non-violent resistance. But the circumstances of *Post* were materially different from ours: the *Post* Plaintiff, after all, kept "talking after [the officer] told him to be quiet," "the

---

[11] In our prior order addressing the Defendants' motion to dismiss Johnson's first amended complaint, we did dismiss (without prejudice) Johnson's false-arrest claim. *See Johnson v. Israel*, 2020 WL 1060007, at *5 (S.D. Fla. Mar. 5, 2020) (Altman, J.). In doing so, we explained: "He was, to be sure, permitted to ask the Deputies why they had stopped him. But he was *not* permitted to ignore their command to produce his license, his registration, and his insurance card. And, notably, the Amended Complaint never suggests that he ever complied—or made any attempt to comply—with any of these directives." *Id.* That was all true in Johnson's first amended complaint. *See generally* First Amended Complaint. But, in his now-operative TAC, Johnson is *clear* that he *was* gathering his license, registration, and insurance card—just as Deputy Metz had requested. TAC ¶¶ 20, 35. In other words, he *does* now allege that he "complied" and "made an[] attempt to comply" with the Deputies' directives. And, even if Johnson's allegations were less than pellucid in this regard, we're guided here by the Supreme Court's admonition that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson*, 551 U.S. at 94 (cleaned up).

29

restaurant was crowded and . . . customers were stopping to watch [the plaintiff's] arrest," and the officer "had also been told earlier by another police officer that [the plaintiff] had recently resisted arrest with violence." *Id.* at 1559. Of course, a reasonable officer *could* think—given the plaintiff's history of attacking officers and his unwillingness to comply with the officer's commands—that the plaintiff may resist again, and that same officer might've been justified, given the accumulating restaurant crowd, in feeling vulnerable to such an attack. On Johnson's allegations, though, nothing like that happened here: Johnson had no prior history of resisting arrest, he never failed to comply with the Deputies' commands, and there was no growing crowd to be mindful of. *Post*, in short, doesn't help the Defendants here.

The Defendants' reliance on *Redlich v. Leen*, 2016 WL 3670575 (S.D. Fla. May 20, 2016) (O'Sullivan, Mag. J.), fares no better.[12] There, the plaintiff arrived at a sobriety checkpoint, where the officers asked to see his license. *Id.* at *2. The plaintiff chose to present his license by pushing it against the inside of his window without rolling the window down. *Id.* The officers "repeatedly" asked the plaintiff "to hand the license outside the window [but] the plaintiff refused." *Id.* at *2, *7. Eventually, one of the officers told the plaintiff: "I have the state attorneys here and my legal advisors. They have authorized me to arrest you if you refuse to hand over your drivers license." *Id.* at *2. Despite this unambiguous warning, the plaintiff still failed to comply. *Id.* Unsurprisingly, the court found that the "plaintiff's actions establish[ed] probable cause or arguable probable cause that the plaintiff committed the crime of obstruction of justice." *Id.* at *7. In our case, though, there's no indication that Johnson

---

[12] The Defendants cite the magistrate judge's report and recommendation because the case settled before the district judge could assess the R&R. *See* Notice of Voluntary Dismissal, *Redlich v. Leen*, No. 16-cv-20001-MORENO (S.D. Fla. May 24, 2016), ECF No. 45.

refused to hand over his license. In fact, Johnson alleges that he *did* hand over his license. TAC ¶¶ 20, 35. *Redlich*, in other words, cannot guide us here.

The Defendants' final case—*Ryder v. Andrews*, 2016 WL 9503729 (M.D. Fla. June 22, 2016)— helps them even less. In *Ryder* (as in *Redlich*), the officers "asked [the plaintiff] for his license and registration but [the plaintiff] did not provide this information." *Id.* at *2. In granting qualified immunity to the officers *at summary judgment*, the court concluded that the plaintiff's refusal to "provid[e] his license and registration impeded the legal traffic stop" and that, "[w]hen he repeatedly demanded to know why he was stopped instead of providing his license and registration, [the plaintiff] opposed [the officers'] execution of their legal duty." *Id.* at *6. Fair enough. But our facts are just different. Again, read in the light most favorable to Johnson, the TAC gives us no basis to conclude that he "repeatedly" demanded information "instead" of providing the documents the Deputies wanted. Johnson, in other words, didn't "impede[ ] the legal traffic stop." *Ryder* thus doesn't alter our conclusion.

*     *     *

"Freedom of speech is one of the most remarkable and celebrated aspects of American constitutional law. It helps define who we are as a nation." Owen M. Fiss, *Free Speech and Social Structure*, 71 IOWA L. REV. 1405, 1405 (1986). This reverence is embodied—as Justice Brennan once observed— in our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Because Johnson's speech couldn't (even *arguably*) have supplied the Deputies

with probable cause to arrest him, the Defendants' motion to dismiss Johnson's false-arrest claim (as set out in Counts I and II) is **DENIED**.

### 3. The Searches

Johnson has also plausibly alleged that the Deputies violated his clearly established rights by searching his car (twice) without a warrant. "[O]ur analysis begins, as it should in every case addressing the reasonableness of a warrantless search, with the basic rule that 'searches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The Defendants seek refuge under two such exceptions: (1) the reasonable-suspicion-of-danger exception outlined in *Michigan v. Long*, 463 U.S. 1032 (1983); and (2) the inventory-search exception set out in *South Dakota v. Opperman*, 428 U.S. 364, 365 (1976). Neither applies here.

#### a.  The Reasonable-Suspicion-of-Danger Exception

The Defendants contend that their first search—the one they conducted at the scene—fell into the reasonable-suspicion-of-danger exception to the warrant requirement. In *Terry v. Ohio*, 392 U.S. 1, 27 (1968), the Supreme Court held that an officer may stop and frisk a suspect "where he has reason to believe that he is dealing with an armed and dangerous individual." Two decades later, in *Michigan v. Long*, the Court explained that, although *Terry* itself "involved the stop and subsequent pat-down of a person," *Terry*'s rationale could be extended—in limited circumstances—to justify the search of a suspect's car. 463 U.S. at 1047; *see also Maryland v. Buie*, 494 U.S. 325, 332 (1990) ("In a sense, *Long* authorized a 'frisk' of an automobile for weapons."). In so holding, the Court laid down the following legal principle:

> [T]he search of the passenger compartment of an automobile, limited to those areas
> in which a weapon may be placed or hidden, is permissible if the police officer
> possesses a reasonable belief based on "specific and articulable facts which, taken
> together with the rational inferences from those facts, reasonably warrant" the officers
> in believing that the suspect is dangerous and the suspect may gain immediate control
> of weapons.

*Id.* at 1049 (quoting *Terry*, 392 U.S. at 21). Put simply, "where police have reasonable suspicion . . . to believe that a driver may be armed and dangerous, they may conduct a protective search for weapons not only of the driver's person but also of the passenger compartment of the automobile." *Minnesota v. Dickerson*, 508 U.S. 366, 374 (1993).

Accepting Johnson's allegations as true, *Long*'s exception to the warrant requirement isn't applicable here. *First*, the TAC includes no allegations from which a reasonable officer could plausibly conclude that either Johnson or his friend were "armed." Johnson doesn't allege, for instance, that the Deputies saw a gun lying in plain view, that he or his friend mentioned a gun, that he or his friend made any furtive movements towards their waistbands, or that some third party had reportedly seen a gun in his car.[13] *Second*, no reasonable officer could have concluded, on our allegations, that Johnson or his passenger were "dangerous." There's no indication, for example, that Johnson or his passenger resisted the officers, raised their voices, or were otherwise hostile *in any way*. To the contrary, the scene was so low-stress that the Deputies allowed Johnson's passenger to walk away—belying any claim that they perceived him as threatening or dangerous. *Third*, it would be unreasonable, given what Johnson

---

[13] Indeed, the Defendants never even *argue* that the Deputies had reasonable suspicion to believe that there was a weapon in Johnson's car. *See* MTD at 13–17. They've thus waived any such argument— at least for purposes of *this* motion. *See, e.g.*, *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived."); *Cont'l Tech. Servs., Inc. v. Rockwell Int'l Corp.*, 927 F.2d 1198, 1199 (11th Cir. 1991) ("An argument not made is waived . . . .").

has said, to believe that either Johnson or his friend were in a position to gain "immediate control of weapons." Johnson, after all, was sitting handcuffed on the back of his truck, and Johnson's friend had left the area *at the Deputies' urging*.

The facts of *Michigan v. Long* thus bear very little resemblance to our case. There, recall, the officers' search was lawful because (1) it was conducted *after* midnight in a rural area, (2) the officers had seen a car drive erratically and swerve into a ditch, (3) the driver appeared intoxicated and failed to respond to their commands, and (4) the officers observed a "large hunting knife" on the floor of the driver's side of the car. 463 U.S. at 1035–36. Of course, none of these crucial facts appear in our case—and the Defendants never suggest that they do.

Just last year, the Eleventh Circuit found unconstitutional a search that, in salient ways, resembles ours. *See United States v. West*, 806 F. App'x 892 (11th Cir. 2020). In *West*, the Eleventh Circuit reversed the district court's order denying the defendant's motion to suppress. *Id.* at 896. In doing so, the court explained that, contra *Long*, (1) "the pertinent events in this case occurred during daylight hours and in a populated area," (2) "[n]othing evidences that [the defendant] was driving or behaving erratically or that [he] was intoxicated," (3) the defendant never "exhibit[ed] aggressive behavior toward the officers," and (4) "[t]he officers also observed no weapons in plain view in the vehicle." *Id.* Our case is just the same. There's no evidence that the pertinent events took place in a dark or unpopulated area. Nothing in the complaint suggests that Johnson was driving erratically or that he was intoxicated. Johnson never, on the facts presented in the TAC, acted aggressively towards the Deputies. And the Deputies never saw any kind of weapon in plain view. As in *West*, then, the Deputies' search was unconstitutional.

34

We also find persuasive the Fifth Circuit's decision in *Estep v. Dallas County*, 310 F.3d 353 (5th Cir. 2002). In that case, the court denied qualified immunity after finding that the officer had violated the law *Long* had clearly established. *Id.* at 360–61. What's so interesting about *Estep* is that the court came to this conclusion *even though* "(1) [the suspect's] vehicle contain[ed] an NRA sticker; (2) [the suspect's] vehicle contain[ed] camouflage gear; (3) [the suspect] show[ed] [the officer] that he had a key chain which contained mace; (4) [the suspect] [got] out of the car to hand [the officer] his identification; and (5) [the suspect's] manner in answering [the officer's] questions [was uncooperative]." *Id.* at 358. The court acknowledged that "no Fifth Circuit case . . . directly addresses whether a reasonable officer could conclude, based on these specific facts, that a citizen posed a danger and could gain immediate control of a weapon," but nevertheless held that "the constitutional violation in [that] case [was] clear-cut and obvious" under the test laid out in *Long. Id.* at 360–61. If the officers weren't entitled to qualified immunity in a case where the suspect was uncooperative, showed the officer his mace, and got out of his car without permission, then our Deputies—faced with *far* less—have no plausible claim to immunity either.

We thus have no difficulty concluding that the Deputies violated clearly established law—at least when we take Johnson's facts as true and view them in the light most favorable to him. As we've said, a right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. And the Eleventh Circuit has recognized that a right may become clearly established because of "(1) the obvious clarity of constitutional or statutory language; (2) broad holdings or statements of principle in case law that are not tied to particularized facts; or (3) fact-specific judicial precedents that

are not fairly distinguishable." *Eloy*, 289 F. App'x at 346 (citing *Vinyard*, 311 F.3d at 1350–52). Our case fits neatly into that second method.

About that second method, the Supreme Court has said that "general statements of the law are not inherently incapable of giving fair and clear warning" and that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope*, 536 U.S. at 741 (cleaned up). "To find that a broad principle of law clearly establishes the law as to a specific set of facts, it must do so with obvious clarity to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Gennusa v. Canova*, 748 F.3d 1103, 1113 (11th Cir. 2014) (quoting *Coffin v. Brandau*, 642 F.3d 999, 1014–15 (11th Cir. 2011) (en banc)).

We think the general legal principle set out in *Long*—that a protective search is permissible only when an officer possesses a reasonable belief that "the suspect is dangerous and [that] the suspect may gain immediate control of weapons"—applies with obvious clarity here. 463 U.S. at 1049. That's because, viewed in the light most favorable to Johnson, the Deputies could've entertained *no* reasonable belief that Johnson (or his friend) had a weapon in the car, that Johnson (or his friend) were dangerous, or that anyone—including and especially Johnson or his friend—would gain "immediate control" of any non-existent weapons in the car. In these circumstances, then, any objectively reasonable officer would've known that a warrantless search was unconstitutional. *Cf. Crocker*, 886 F.3d at 1137 (finding that an officer violated clearly established law under the "broad principle method" by subjecting the plaintiff to a warrantless search).

Looking to escape this rather straightforward conclusion, the Defendants advance two main arguments—both unavailing.

*First*, the Defendants inject facts that appear *nowhere* in Johnson's complaint. They say, for example, that, after conducting an "online search of [Johnson's] address," they think "it is not possible that the [friend's] porch was at a far distance from the vehicle." MTD at 15–16. The implication (we suppose) is that the friend—whom the Deputies found so innocuous that they let him walk away— might've been able to take "immediate control" of a weapon. And, to create a reasonable suspicion of danger, they insist that "tensions between the parties were already high." *Id.* at 16. But *neither* "fact" appears anywhere in Johnson's complaint. And "the scope of review for a Rule 12(b)(6) dismissal is ordinarily 'limited to the four corners of the complaint.'" *Winstead v. Williams*, 750 F. App'x 849, 852 (11th Cir. 2018) (quoting *Speaker v. U.S. Dep't of Health & Human Servs.*, 623 F.3d 1371, 1379 (11th Cir. 2010)).

*Second*, the Defendants (essentially) ask us to view the facts in the light most favorable to *them*. To support their view that the Deputies reasonably concluded that Johnson and his friend were "dangerous" and that they might take "immediate control" of some non-existent weapon, the Defendants note that the friend was "unrestrained," that Johnson was "uncooperative," and that the Deputies had displayed "displeasure" before they "snatched [Johnson's] phone away." MTD at 15– 16. But, when viewed in the light most favorable to Johnson, these "facts" look very different: Johnson, remember, wasn't "uncooperative" (at least not according to him); the friend was unrestrained *only because* the Deputies found him so harmless that they allowed him to amble away; and, if anyone expressed anger or aggression, it was the Deputies, not Johnson. *Cf. Michel v. NYP*

37

*Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016) ("The allegations in the complaint must be accepted as true and construed in the light most favorable to the plaintiff.").[14]

### b. The Inventory-Search Exception

The Defendants next try to excuse *both* of their warrantless searches under the inventory-search exception—an exception that's likewise inapposite here. "Though the police generally need a warrant to conduct a search, they do not need a warrant to search an impounded car if they (1) had the authority to impound the car, and (2) followed department procedures governing inventory searches." *United States v. Isaac*, 987 F.3d 980, 988 (11th Cir. 2021); *see also United States v. Williams*, 936 F.2d 1243, 1248 (11th Cir. 1991) (same). "An officer has the authority to impound a car if his decision to impound it is 'in good faith, based upon standard criteria, and not solely based upon suspicion of evidence of criminal activity.'" *Isaac*, 987 F.3d at 988–89 (quoting *Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992)). The purpose of requiring standard criteria is to "forbid[] uncanalized discretion to police officers conducting inventory searches." *Florida v. Wells*, 495 U.S. 1, 4 (1990). "The government carries the burden to show that the requirements of this exception were met." *United States v. Wilson*, 979 F.3d 889, 910 (11th Cir. 2020).

The Defendants' halfhearted inventory-search argument is meritless. They, in fact, have proffered *no* standardized impound or inventory-search policies at all. So, we have no way of knowing whether they impounded or searched Johnson's truck in accordance with the standard criteria that federal courts have *long* demanded. *See, e.g.*, *Colorado v. Bertine*, 479 U.S. 367, 375 (1987) ("Nothing . . . prohibits the exercise of police discretion [in impounding a car] so long as that discretion is

---

[14] Even if we were to veer from basic blackletter law and construe Johnson's allegations in the Defendants' favor, *none* of those allegations provide any basis to think that there was a weapon in the car. And the Defendants never contend otherwise.

exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity."); *Opperman*, 428 U.S. at 372 ("The decisions of this Court point unmistakably to the conclusion reached by both federal and state courts that inventories pursuant to standard police procedures are reasonable."); *Williams*, 936 F.2d at 1248 ("If a search is to be upheld under the inventory search doctrine, therefore, the police must first have the authority to impound the vehicle and must then follow the procedures outlined in the policy.").

Given all this, we think the Deputies violated clearly established law when they conducted an inventory search without following—so far as we can tell—*any* standard police procedures. As the Eleventh Circuit recognized almost two decades ago—citing both *Opperman* and *Bertine* (opinions from the 1970s and 80s)—"the decision to impound [a] vehicle [must] be[] made in good faith, based upon standard criteria, and not solely based upon suspicion of evidence of criminal activity." *Sammons*, 967 F.2d at 1543. In *Sammons*, the court denied qualified immunity on an unlawful-inventory-search claim partly because there was a genuine issue as to whether "the impoundment and the inventory search were conducted according to standard . . . procedures." *Id.* at 1544. We reach the same result here.

To recap, then: we have *both* a "broad legal principle" (from decisions like *Williams*) that applies "with obvious clarity" to this case *and* certain "fact-specific precedents" (like *Sammons*) demonstrating the need for standardized policies. *Vinyard*, 311 F.3d at 1351–52. Having failed to comply with the admonitions of either *Williams* or *Sammons*, the Defendants cannot fairly expect to cloak themselves in qualified immunity here.

Trying to parry, the Defendants offer only one argument: that "the Deputies had discretion, within the realm of reason, to make a decision to impound the Plaintiff's vehicle at that point in time." MTD at 18. Their position seems to be that the Deputies could—consistent with constitutional

constraints—impound and inventory Johnson's car *so long as* they exercised their discretion within "the realm of reason." *Id.* In support of this contention, they cherry-pick from *United States v. Handy*, 592 F. App'x 893, 907 (11th Cir. 2015) (using the phrase "realm of reason"). *Id.* But *Handy* never held that the decision to impound and search a vehicle should be left to the officer's discretion. Instead, *Handy* simply reiterated what the Eleventh Circuit has *always* said about inventory searches: that "a police officer's decision to impound a car may involve discretion but must be made according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Handy*, 592 F. App'x at 907 (finding an inventory-search constitutional partly because it was "based on established Police Department procedure"). Why's that unsurprising? Because the Defendants' nebulous realm-of-reason standard embodies precisely the kind of unbridled police discretion that the inventory-search doctrine intended to foreclose. *See Wells*, 495 U.S. at 8 (Brennan, J., concurring) ("Our cases clearly hold that an inventory search is reasonable under the Fourth Amendment only if it is done in accordance with standard procedures that *limit* the discretion of the police.").

*       *       *

On Johnson's facts, the Deputies violated clearly established law by executing a warrantless search on his car—*both* at the scene *and* then again when the car was impounded. And, at this stage, we cannot say that any exception to the warrant requirement applies. The Defendants' motion to dismiss Johnson's unlawful-search claims (as they appear in Counts I and II) is therefore **DENIED**.[15]

---

[15] By failing to champion the application of some *other* warrant exception, the Defendants have waived any reliance on those exceptions. *See, e.g.*, *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed waived."). In an abundance of caution, though, we note that the search-incident-to-arrest exception outlined in *Arizona v. Gant* plainly doesn't apply here. In *Gant*, the Supreme Court held that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is

### C.  The Official-Capacity Claims

Johnson has failed to plausibly state official-capacity claims against Sheriff Israel and the Deputies. "Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). "Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents"—in our case, the City of Dania Beach. *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). And the Supreme Court has held that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). "Instead, it is when execution of a government's *policy or custom*, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694 (emphasis added).

Although Johnson's theory for imposing liability on the City isn't entirely clear, he appears to premise his claim for municipal liability on (1) the City's failure to train or supervise its officers and (2) the City's failure to employ adequate hiring practices. *See* TAC ¶ 68 (alleging that "Defendant Israel has maintained a long-standing, widespread history of failure to properly hire, and/or train, and/or supervise, and/or discipline his Deputy Sheriffs for, among other things, unlawful detentions or arrests, even though he had been on notice of the unlawful conduct by his employees and/or agents"). We consider each of these theories below.

### 1.  Failure to Properly Train or Supervise

---

reasonable to believe the vehicle contains evidence of the offense of arrest." 556 U.S. at 351. Because Johnson was handcuffed at the back of his car and because the Deputies had no basis to believe that a search of the car's inner compartments might reveal evidence of unlawful tinting or obstruction (the arrest offenses), the search-incident-to-arrest exception (which the Defendants never invoke) is inapposite here.

We've previously described the conditions in which a city may be held liable under § 1983 for its failure to train or supervise its employees. *See Rebalko v. City of Coral Springs*, 2020 WL 6446042, at *23 (S.D. Fla. Nov. 3, 2020) (Altman, J.). As we explained there, the Supreme Court has held that, in "limited circumstances," a municipality may be liable for failing to train or supervise its employees. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989); *see also Williams v. DeKalb Cnty.*, 327 F. App'x 156, 160–61 (11th Cir. 2009) ("A police department's failure to train or supervise its officers can constitute a 'policy' sufficient to trigger governmental liability but only in limited circumstances[.]"). These circumstances arise when a city's "employees cause a constitutional injury as a result of the municipality's policy- or custom-based failure to adequately train or supervise its employees." *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1188 (11th Cir. 2011).

Although a city "rarely will have an express written or oral policy [or custom] of inadequately training or supervising its employees," *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998), the Supreme Court has said that a city may be liable for implementing such a policy or custom when its failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact," *Canton*, 489 U.S. at 388. "To establish . . . such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1350. "Without notice that . . . training [or supervision] is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen [a policy] that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

"Establishing notice of a need to train or supervise is difficult." *AFL-CIO*, 637 F.3d at 1189. "A city may be put on notice in two ways." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1293 (11th

Cir. 2009). *First*, "[a] pattern of similar constitutional violations by untrained [or unsupervised] employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train [or supervise]." *Connick*, 563 U.S. at 62 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997)). *Second*, where "the need for more or different training is so obvious, . . . the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. This "so obvious" situation is rare, and the Court has only hypothesized that it *might* be met in extreme circumstances—as where a municipality provides its officers with firearms and then fails to give those officers *any* training on the use of deadly force. *Id.*

Given this standard, Johnson's allegations are plainly deficient. *First*, Johnson fails to plausibly allege that there's *anything* wrong with the City's training or supervision. All Johnson says is that the City has a "history" of failing to "properly" train or supervise its officers. But what *is* the City's policy and what (if anything) is improper about it? We don't know because Johnson never tells us. Johnson, in short, has given us nothing more than the kinds of "legal conclusions masquerading as facts" that courts have routinely found insufficient to state a claim. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004) (cleaned up); *see also Watts v. City of Hollywood*, 146 F. Supp. 3d 1254, 1272 (S.D. Fla. 2015) (Altonaga, J.) (dismissing a claim where the complaint didn't "contain any allegations describing a particular training program, let alone allegations highlighting why such a training program is defective and how the defect is a widespread problem"); *Grimm v. City of Boca Raton*, 2015 WL 4483974, at *6 (S.D. Fla. July 22, 2015) (Marra, J.) (finding "inadequate" the "conclusory allegation that [the defendant] 'failed to give adequate training'").

*Second*, even if Johnson *had* pointed to some flaw in the City's training or supervision, he *hasn't* averred that the City *knew* about that deficiency or that it was deliberately indifferent to the problem.

So, for example, Johnson claims that Sheriff Israel "ignor[ed] past incidents of misconduct on behalf of his agents/officers which has resulted into numerous civil rights complaints" and that he made "cash settlement payouts to victims of false arrest." TAC ¶ 65. But Johnson never claims that those "numerous civil rights complaints" or "settlements" arose from meritorious claims—which is reason enough to disregard them. *See Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) (declining to impose municipal liability where the plaintiff "never demonstrated that past complaints of police misconduct had any merit" and noting that "the number of complaints bears no relation to their validity").[16] Nor does Johnson suggest that those other cases bore any resemblance to the facts we have here—again, grounds for dismissal. *See Mercado*, 407 F.3d at 1162 (finding no pattern of constitutional violations where the plaintiff couldn't "show that any [prior instances] involved factual situations that are substantially similar to the case at hand").[17] Johnson's vague allusions to prior complaints and settlements thus aren't enough to show that the City was on notice of any deficiency in its practices.[18]

---

[16] *See also, e.g.*, *Peguero v. Delaurentos*, 2012 WL 13012772, at *8 (S.D. Fla. Feb. 14, 2012) ("Jordan, J.) ("It is not enough . . . to show that there were complaints. . . . Rather, [the plaintiff] must show that there were a sufficient number of *valid* complaints to put the County on notice that additional training was necessary." (emphasis added)).

[17] *See also, e.g.*, *Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 942 (11th Cir. 2017) (finding no notice where the plaintiff "failed to identify a pattern of *similar* constitutional violations" (emphasis added)); *Carter v. Columbus Consol. Gov't*, 559 F. App'x 880, 881 (11th Cir. 2014) (finding no pattern of constitutional violations where past complaints against an officer were "unrelated" and "not connected" to the plaintiff's false-arrest claim).

[18] And, even if none of that were true, Johnson "makes no material connection between [his] allegations of the training and supervision that [the Deputies] received, on the one hand, and the actions taken by [the Deputies] during [his] arrest, on the other." *Paul v. Bradshaw*, 2013 WL 12084298, at *11 (S.D. Fla. Aug. 7, 2013) (Rosenbaum, J.). In other words, Johnson hasn't adequately alleged *causation*. For this reason, too, his training/supervision theory fails.

*Third*, while it probably goes without saying, this isn't the rare case where "the need for more or different training [or supervision] is so obvious[ ] . . . [that] the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. While it may be "obvious" that police officers need *some* training on the topics Johnson complains about—*i.e.*, false arrests and improper searches—the complaint never claims that the Deputies received *no* such training or supervision. *See* TAC ¶ 68 (alleging that the City failed to "properly" train or supervise). As the Fifth Circuit has said, the "so obvious" path "is generally reserved for those cases in which the government actor was provided *no training whatsoever*"—something Johnson elected not to allege. *Pena v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018) (emphasis added). In any event, Johnson fails to explain *how* or *why* the City's training was insufficient—an omission that renders his claim fatally conclusory and implausible. *Cf. Denham*, 675 F. App'x at 942 ("The Supreme Court has never determined that the need for 'more or different' training was obvious.").

### 2.  Failure to Properly Hire

Johnson's oblique references to the City's (alleged) "failure to properly hire," TAC ¶¶ 68–69, fares no better. Although there isn't much law on this theory, we're guided by many of the same principles that drove the supervision and training claims. As we've said, to impose liability on a municipality under § 1983, a plaintiff must generally "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Brown*, 520 U.S at 403. This requires the plaintiff to identify a "deficiency" in a city's hiring program, to show that the city was "deliberately indifferent" to the need for better practices, and to establish that the deficiency is "closely related to the ultimate injury." *Canton*, 489 U.S. at 388–91. "A pattern of similar constitutional violations by [poorly hired] employees is ordinarily necessary to demonstrate deliberate indifference[.]" *Connick*, 563 U.S. at 62; *see generally Brown*, 520 U.S.

at 408 (suggesting that a municipality may be liable under a deficient-hiring theory where the "hiring practices are generally defective" and there are a "pattern of injuries linked to [those] hiring practices").

Johnson's allegations fall far short of this standard. *First*, beyond his bare-bones recital of the legal theory—that "[i]t was Defendant Israel's *de facto* policy of failing to properly screen and investigate potential applicants"—Johnson gives us *no* facts from which we might reasonably conclude that the City's hiring policies were *actually* defective. *See* TAC ¶¶ 65–69. Johnson doesn't even tell us what the City's hiring practices were or why they were problematic. Again, his threadbare allegations just don't cut it. *See Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." (cleaned up)). *Second* (and again), Johnson's failed to allege that the City knew that its hiring practices were leading to constitutional violations, and he hasn't suggested that the City acted with deliberate indifference to this problem. In this respect, Johnson points only to "historical abuse and violations of Human, Civil, and Constitutional Rights passed down over the years" through various BSO sheriffs. TAC ¶ 69. But Johnson never explains what these incidents were, how they related to hiring, or whether they bore any resemblance to the facts of our case. *Third*, Johnson never claims that, when they were interviewed for the jobs they now hold, the Deputies exhibited *any* red flags at all—let alone the kinds of red flags that should've alerted the BSO that they'd be a problem. In other words, the Deputies may very well have been hired *even if* the City's hiring and screening processes had been *perfect*. Johnson has thus failed to establish a causal link between some supposed hiring deficiency and the constitutional violations he's alleged. *See Canton*,

489 U.S. at 391 (noting that the deficient policy or custom must have "actually caused" the constitutional injury). For all these reasons, therefore, Johnson's improper-hiring theory fails.[19]

*      *      *

The Supreme Court has long instructed that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. In enacting § 1983, "Congress did not intend to impose liability on a municipality unless *deliberate* action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Brown*, 520 U.S. at 400. Because Johnson hasn't plausibly shown that the City should be responsible for the constitutional violations he's alleged, his official-capacity claims against Sheriff Israel, Deputy Augustus, and Deputy Metz are **DISMISSED with prejudice**.[20]

---

[19]     One more thing. In *Brown*, the Court "assum[ed] without deciding that proof of a *single* instance of inadequate screening [may] trigger municipal liability." 520 U.S. at 413 (emphasis added). In making that assumption, the Court explained:

> Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

*Id.* at 411. If that seems like an exacting standard, that's because it is. The Supreme Court was clear that "[c]ases involving constitutional injuries allegedly traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause." *Id.* at 415. As a result, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405.

     Since Johnson never invokes this standard, he's probably waived any reliance on *Brown*. Even if he had mentioned that standard, though, his complaint plainly fails to meet it. That's because he hasn't pointed to *anything* in the Deputies' backgrounds—much less anything that, during their screening and hiring interviews, would've made it obvious to the BSO that they would later violate anyone's constitutional rights.

[20]     Johnson appears to bring a supervisory-liability claim against Sheriff Israel in his official capacity. *See* TAC ¶¶ 63, 71 (noting that Sheriff Israel "is being sued in his official capacity" as a

### D. The Punitive-Damages Claim

One last thing. The Defendants ask us to strike Johnson's punitive-damages claim against Sheriff Israel and the Deputies. MTD at 18–19. On the one hand, the Defendants are right "that punitive damages cannot be recovered from a municipality in a 42 U.S.C. § 1983 case or [an officer] in his official capacity unless expressly authorized by statute." *Id.* at 19 (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981)); *see also Colvin v. McDougall*, 62 F.3d 1316, 1319 (11th Cir. 1995) (holding that "punitive damages are generally not allowed against a municipality" and that "a punitive damage award against [the sheriff] in his official capacity" is likewise barred); *Cline v. Broward Cnty. Sheriff's Off.*, 2007 WL 2453558, at *4 (S.D. Fla. Aug. 23, 2007) (Cohn, J.) (finding that a § 1983 plaintiff

---

"supervisory defendant"). This claim likewise fails because (as we've explained) a suit against an officer in his *official* capacity is simply a suit against the municipality, and (for all the reasons we've articulated) there can be no municipal liability here. *Cf. Casey v. City of Miami Beach*, 2005 WL 8168328, at *2 (S.D. Fla. Feb. 15, 2005) (Jordan, J.) (striking a supervisory-liability count as "duplicative" where the plaintiff had a separate "claim pursuant to § 1983 against the City directly and through its employees").

In any event, Johnson comes nowhere close to meeting the standard for imposing supervisory liability. "Supervisor liability under § 1983 occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Braddy v. Fla. Dep't of Lab. & Emp. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998) (cleaned up). A causal connection can be established when (1) "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation and he fails to do so"; (2) "when the supervisor's improper custom or policy leads to deliberate indifference to constitutional rights"; or (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Douglas v. Yates*, 535 F.3d 1316, 1322 (11th Cir. 2008).

Johnson makes none of these allegations here—at least not plausibly. Johnson doesn't aver, for instance, that Sheriff Israel personally participated in his stop, arrest, or search. Nor does he adequately allege any "causal connection" between his claim and Sheriff Israel's actions. He's also offered no plausible history of similar "widespread abuse." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (recognizing that, to put a supervisor on notice, the abuse "must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences"). He hasn't alerted us to any custom or policy reflecting a deliberate indifference to his (or anyone else's) constitutional rights. And he hasn't even tried to allege that Sheriff Israel directed the Deputies to act unlawfully *in his case*. In short, Johnson can assert no claim for supervisory liability here.

"cannot recover punitive damages since counties or municipal defendants are immune from their imposition"); *Brooks v. Jenne*, 2005 WL 5488060, at \*4 (S.D. Fla. July 15, 2005) (Martinez, J.) ("Punitive damages are not available against municipalities, and are therefore not available against [the sheriff], who is being sued in his official capacity.").

On the other hand, Johnson has also sued the Deputies in their *individual* capacities. And the Eleventh Circuit has held that, "[i]n a § 1983 action, punitive damages are . . . available from government officials when they are sued in their individual capacities." *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1047 (11th Cir. 2008); *see also Graham*, 473 U.S. at 167 n.13 (recognizing that "punitive damages are . . . available in a suit against an official personally" under § 1983); *Davies v. Sheriff of Orange Cnty.*, 2014 WL 12618717, at \*8 (M.D. Fla. Dec. 5, 2014) (Conway, J.) ("Punitive damages are recoverable under § 1983 from defendants sued in their personal capacities[.]"). So, while Johnson's punitive-damages claim against the City (or against the Defendants in their *official* capacities) must be **STRICKEN**, the Defendants have provided no basis to disturb Johnson's claim for punitive damages against the Deputies in their *individual* capacities.

## CONCLUSION

After a careful review of the record, the briefing, and the applicable law, the Court hereby

**ORDERS AND ADJUDGES** that the Motion to Dismiss [ECF No. 82] is **GRANTED in part and DENIED in part** as follows:

1.  Johnson's claims that the Deputies, in their *individual* capacities, unconstitutionally stopped him, as alleged in Counts I and II of the Third Amended Complaint, are **DISMISSED with prejudice**.[21]

2.  Johnson's claims that the Deputies, in their *individual* capacities, unconstitutionally arrested him and searched his truck, as alleged in Counts I and II of the Third Amended Complaint, **SURVIVE**.

3.  Johnson's claims against the Deputies in their *official* capacities, as alleged in Counts I and II of the Third Amended Complaint, are **DISMISSED with prejudice**.

4.  Johnson's claims against Sheriff Israel, as alleged in Count III of the Third Amended Complaint, are **DISMISSED with prejudice**.

5.  Johnson's claims for punitive damages against the Deputies in their *individual* capacities **SURVIVE**. Otherwise, Johnson's punitive-damages claims are **STRICKEN**.[22]

---

[21]     Rule 15 of the Federal Rules of Civil Procedure allows a party to amend a pleading once as a matter of course. *See* FED. R. CIV. P. 15(a)(1). After that, a party may amend its pleading "only with the opposing party's written consent or leave of the court." FED. R. CIV. P. 15(a)(2). While the Court "should freely give leave when justice so requires," *id.*, it need not do so if (1) "there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed"; (2) "allowing amendment would cause undue prejudice to the opposing party"; or (3) "amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001).

         For three reasons, we dismiss this and (as we'll soon see) a few other claims *with* prejudice. *First*, despite having received several opportunities to amend his complaint, Johnson has failed to remedy the deficiencies we've repeatedly identified. Indeed, we were clear in our first motion-to-dismiss order that "Johnson will not be given another bite at the apple. If, on a subsequent motion to dismiss, the Court dismisses Johnson's claims again, that dismissal will be *with prejudice*." *Johnson*, 2020 WL 1060007, at *11. We follow through on that admonition here. *Second*, as this Order makes plain, any future amendment of the dismissed claims would be futile. *Third*, allowing Johnson to amend at this *very* late stage of the case would unduly prejudice the Defendants.

[22] Johnson's claims against the City of Dania Beach, as alleged in Count IV of the Third Amended Complaint, will remain because the Defendants never moved to dismiss that count.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 21st day of December 2021.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record